IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

United States of America ex rel.    )
JUAN CABALLERO,                     )
                                    )
          Petitioner,               )
                                    )
     v.                             )    No. 97 C 2829
                                    )
MARCUS HARDY, Warden, Stateville    )
Correctional Center                 )
                                    )
          Respondent.               )

<u>MEMORANDUM OPINION AND ORDER</u>

Petitioner Juan Caballero filed an amended petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For all the reasons that follow, that petition is denied.

**I.**

**Petitioner's Trial and Sentencing[1]**

Petitioner's written statement[2] said that he, Luis Ruiz, Placido LaBoy, and Nelson Aviles were entering a restaurant

---

[1] This summary of the facts was taken from *People v. Caballero*, 794 N.E.2d 251, 256-59 (Ill. 2002). *See Whitman v. Bartow*, 434 F.3d 968, 969 (7th Cir. 2006) (factual determinations made by state courts are presumed to be correct for the purposes of federal habeas petitions).

[2] At petitioner's trial, the State introduced evidence of a statement made by petitioner on the night of his arrest. Petitioner denied making the statement, claiming that he was beaten by two police officers and threatened with more beatings if he did not sign a written statement they placed in front of him. The State's witnesses testified that when petitioner was told by the investigating officer that co-defendant Luis Ruiz had already made a statement implicating him, he gave his own version of the killings.

called King Castle as Arthur Salcido, Michael Salcido and Frank
Mussa were leaving.  Michael Salcido approached Ruiz and asked if
he knew where they could buy some marijuana.  After Ruiz said no,
Michael asked if he knew Juan Cortez.  Petitioner, Ruiz, LaBoy
and Aviles were members of the Latin Kings and they knew that
Juan Cortez was a Latin Eagle, but they played along with
Michael, letting him think that they were members of the same
gang as Cortez.  Michael bragged about his connections to the
Latin Eagles and claimed to have driven the car during several
"hits."

    The three teenagers got into the front seat of their car,
while petitioner, Ruiz, LaBoy and Aviles got in the back seat,
and they drove to a nearby alley on the pretense of making a drug
deal.  Arthur and Frank were told to stay in the car while
petitioner and the co-offenders walked down the alley with
Michael.  Once they were out of sight, they began to beat and
kick Michael.  When he was on the ground, they revealed they were
Latin Kings.  Petitioner and Aviles stayed with Michael while
Ruiz and LaBoy returned to the car.  They came back a few minutes
later, with the car.  LaBoy was driving, with Arthur and Frank
still in the front seat.  Ruiz was in the back seat. Petitioner,
Aviles, and Michael got in the back seat and LaBoy drove to
another alley.  During this brief drive, the four conversed in

Spanish and decided that they had to kill the three young men so that they could not be identified.

After they stopped, Ruiz handed petitioner a gun. Petitioner and LaBoy walked Michael and Frank down the alley and ordered them to lie facedown in a snowbank. Petitioner gave the gun to LaBoy and told him to stay there while he went back to the car to see what was happening. When he got there, he saw Aviles repeatedly stabbing Arthur, who was in the right front seat of the car. The medical examiner testified that Arthur had 18 neck wounds and eight chest wounds.

Ruiz told petitioner to "go get the other guy." Frank was led back to the car and told to close his eyes and get in the left front seat. LaBoy told petitioner to stab him, but petitioner stated that he had never stabbed anyone and would rather shoot him. LaBoy grabbed the knife from Aviles and began stabbing Frank. Petitioner stated, "I told him to slice his throat." The medical examiner testified that Frank died as a result of 21 stab wounds to the neck, jaw, chest and back. Petitioner then went back to where Michael was lying in the snow to watch him.

Finally, petitioner led Michael back to the car and told him to keep his eyes closed and get in the back seat. Michael opened his eyes and, when he saw the others, began to resist.

3

Petitioner took the knife from LaBoy, grabbed Michael by his hair, and slashed his throat. He continued to stab Michael until he got tired. Michael yelled, "I'm dead. I'm dead. Don't stab me." Petitioner stabbed him a few more times. LaBoy took the knife and stabbed him several more times, to make sure he was dead. The medical examiner testified that Michael had multiple stab wounds, including 24 to the face and neck, 5 to the chest and abdomen, and 3 to the back.

Petitioner said that Ruiz, LaBoy, and Aviles then took several pairs of socks from a suitcase they had found in the car, put the socks on their hands, and attempted to wipe off any fingerprints they might have left. The police recovered two bloody socks near the scene, which were admitted into evidence. In addition, one fingerprint matching Ruiz was found on an outside rear window of the car. As they walked away, LaBoy discarded the knife in a snowbank. The four went to LaBoy's house to clean up. Ruiz stated that he had to return the gun he had been carrying to the person from whom he borrowed it. The others got in a cab to go home.

The assistant state's attorney who questioned petitioner testified that he asked petitioner whether, if he had it to do over, he would do the same thing again. Petitioner replied, "[I]f it was a sure thing." The assistant State's Attorney said,

4

"[T]here's no such thing as a sure thing. You got caught."
Petitioner's response was, "a lot of Kings kill people without
getting caught. . . . I'd kill Michael for sure, but I don't know
about the other two."

Petitioner agreed to return to the scene with the detectives
and to point out where the knife had been discarded. They did
not recover the knife at that time. A knife was discovered in a
snowbank several days later by a passerby, who turned it over to
the police. It had minute bloodstains that were insufficient to
type or identify.

After the jury found petitioner guilty, the sentencing stage
began several days later. At the sentencing stage, the state
introduced evidence of petitioner's prior conviction for unlawful
use of a weapon in 1978, for which he received a sentence of
probation. The jury also heard testimony that while in custody
awaiting trial, defendant solicited another prisoner who was
about to be released to put out a "hit" on the individual
petitioner suspected of informing the police of his involvement
in the murders. Petitioner was sentenced to death.

Three of the four killers – petitioner, Ruiz and LaBoy –
were apprehended within days of the murders, but LaBoy was
released after a preliminary hearing for lack of probable cause.
Along with petitioner, Ruiz was also convicted and sentenced to

death. The fourth, Nelson Aviles, fled to California, where he was eventually arrested in 1988. He agreed to plead guilty and to testify against LaBoy, in return for a sentence of 40 years' imprisonment. The State unsuccessfully sought the death penalty for LaBoy, who received three consecutive natural life sentences. While Ruiz originally received the death penalty, his sentence was overturned and he eventually received a 60-year sentence.

## II.

The procedural history of this case is quite long and complicated. Petitioner appealed his judgment of conviction directly to the state supreme court, raising eighteen claims. On March 23, 1984, the Illinois Supreme Court affirmed. Petitioner's petition for a writ of certiorari to the United States Supreme Court was denied on October 29, 1984.

Petitioner filed a state postconviction petition in November 1985, an amended petition in March 1986, and a second amended petition in April 1986, which the trial court dismissed in 1986 without an evidentiary hearing. Petitioner appealed, raising five claims. With respect to petitioner's claim that his counsel was ineffective for failing to introduce the mitigating testimony of several potential witnesses solely because they were not categorically opposed to the death penalty, the Illinois Supreme Court remanded the case to the trial court to hold an evidentiary

6

hearing. Following the remand, the trial court conducted an evidentiary hearing and denied the petition. Petitioner again appealed and raised the failure to call mitigation witnesses claim. The Illinois Supreme Court affirmed, concluding that petitioner could not show prejudice. Petitioner's petition for a writ of certiorari was denied by the United States Supreme Court on June 1, 1993.

On October 29, 1993, petitioner filed a second postconviction petition, which was dismissed by the trial court on May 29, 1996. Petitioner appealed, raising two arguments: (1) his sentence was unconstitutionally disparate compared with those of LaBoy and Aviles; and (2) the trial court should have "life-qualified" his jury pursuant to *Morgan v. Illinois*, 594 U.S. 719 (1992). The appellate court found that petitioner was entitled to an evidentiary hearing regarding his allegation that his sentence was unconstitutionally disparate from LaBoy, but that he had not made a sufficient showing regarding Aviles. The court also found that *Morgan* was not retroactively applicable to cases on collateral review.

The trial court held the evidentiary hearing and denied the petition. The trial court found that petitioner's death sentence was not unconstitutionally disparate from LaBoy's life sentence because: (1) petitioner was "as involved" as LaBoy and was an

active and willing participant in the killings; and (2) petitioner "was a ruthless killer who exhibited absolutely no remorse for his crime and, in fact, indicated that he would do it again if he could get away with it." Petitioner appealed, arguing that: (1) he was denied due process because the State made arguments regarding roles and relative culpability that was inconsistent with arguments made at LaBoy's sentencing hearing; and (2) his sentence was unconstitutionally disparate compared with that of LaBoy. Finding no due process violation and rejecting petitioner's disparate sentence argument, the appellate court affirmed.

On May 1, 2000, petitioner filed a third postconviction petition, alleging a violation of his rights under Article 36 of the Vienna Convention on Consular Relations. The trial court denied the petition and petitioner appealed, arguing that: (1) petitioner made a substantial showing of a violation of his rights under Article 36; and (2) the trial court erroneously determined that petitioner had procedurally defaulted his claim of ineffective assistance of counsel, and procedural default is not a bar to relief on an Article 36 claim.

On January 10, 2003, the Governor of Illinois, as part of a mass commutation, commuted petitioner's sentence to life imprisonment.

On September 30, 2004, the Illinois Appellate Court affirmed the denial of petitioner's third postconviction petition. The court held that petitioner's Article 36 claim was procedurally defaulted, and petitioner failed to show cause and prejudice to excuse the default. The court rejected petitioner's ineffective assistance claim because it was insufficiently developed in violation of state court rules and was unsupported on the merits. On November 4, 2004, petitioner filed a petition for leave to appeal ("PLA") raising three claims: (1) the International Court of Justice's ("ICJ") rulings suggested that Vienna Convention Article 36 rights should not be subject to state procedural default rules; (2) the ICJ's rulings suggested that a petitioner should not have to show prejudice when alleging a violation of Article 36 rights; and (3) the appellate court should not have made a factual determination that petitioner's contention that he would have halted interrogation had he been informed of his Article 36 rights was not credible. On September 29, 2005, the Illinois Supreme Court denied the PLA.

On January 27, 2005, petitioner sought leave to file a fourth postconviction petition, alleging that his life sentence was unconstitutionally disparate to Ruiz's 60-year sentence. On April 1, 2005, the trial court denied leave because petitioner did not attach transcripts from Ruiz's sentencing hearing, in

contravention of state statutory requirements, and petitioner could not, in any event, satisfy the cause and prejudice test applicable to successive petitions. Petitioner appealed, arguing: (1) the trial court should have granted leave to file the successive petition; and (2) the trial court should not have faulted petitioner for failing to attach sentencing transcripts from Ruiz's hearing, because that case had not yet proceeded to appeal and the proceedings had not been transcribed. On June 8, 2007, the Illinois Appellate Court affirmed. On August 21, 2007, petitioner filed a *pro se* PLA, arguing: (1) the trial court should have granted leave to file a successive petition because petitioner's sentence was unconstitutionally disparate compared to a co-offender's; and (2) the trial and appellate courts erred in finding the petition frivolous and in concluding that the failure to attach transcripts constituted a failure to properly support the petition. On September 5, 2007, petitioner moved to withdraw his PLA. On September 11, 2007, the Illinois Supreme Court granted the motion to withdraw the PLA.

On March 29, 2005, petitioner filed his fifth postconviction petition, claiming that police violated his Article 36 rights to consular notification and access, and that this claim first became viable when the ICJ issued its decision in *Case Concerning Avena and Other Mexican Nationals*, 2004 ICJ 12 (Mar. 31, 2004).

On October 24, 2006, the trial court granted the State's motion to dismiss. Petitioner appealed, and the case was assigned number 1-06-3199.

On February 13, 2008, petitioner filed his sixth postconviction petition, again arguing that his life sentence was unconstitutionally disparate to the 60-year sentence received by Ruiz, this time attaching a transcript of Ruiz's resentencing hearing. On May 2, 2008, the court denied leave to file the successive petition, finding that the claim was defaulted and that petitioner did not meet the cause and prejudice test that might excuse the default. Petitioner appealed, and the case was assigned number 1-09-1285.

Case 1-06-3199 was consolidated with case 1-09-1285 on appeal. Petitioner argued that: (1) the circuit court should have granted an evidentiary hearing because petitioner demonstrated that his rights to consular notification and consultation were violated; and (2) petitioner's right to due process was denied when the circuit court denied leave to file his sixth postconviction petition. On March 31, 2010, the Illinois Appellate Court affirmed the dismissal. The court reasoned that petitioner had defaulted his Article 36 claim, and that he could not show cause and prejudice to excuse the default. The court further found that the claim was barred by *res judicata*

11

because petitioner had raised it in his fourth postconviction petition. On May 5, 2010, petitioner filed a PLA in the Illinois Supreme Court, arguing: (1) petitioner's rights to consular notification and consultation under Article 36 were violated and his due process rights were violated when the trial court rejected the Article 36 claim without a hearing; and (2) petitioner's rights were violated when the trial court denied leave to file his successive sixth petition alleging that his sentence was unconstitutionally disparate when compared with the sentence of a co-offender. On September 29, 2010, the Illinois Supreme Court denied the PLA.

### III.

On April 21, 1997 petitioner filed a § 2254 petition in this court, raising seven claims. After the stay in this case was lifted, petitioner filed an amended § 2254 petition, raising the following claims: (1) the jury instructions misstated Illinois law regarding accountability; (2) the prosecutor made inflammatory remarks during closing argument; (3) the state pursued incompatible theories of culpability in the trial of petitioner and the trial of a co-offender thirteen years later; (4) petitioner's life sentence is disproportionately severe compared with a co-offender's 60-year sentence; (5) petitioner was denied effective assistance of counsel at the penalty phase

12

because counsel did not call certain mitigation witnesses; (6) petitioner was denied effective assistance of counsel because counsel failed to raise petitioner's Article 36 rights; and (7) petitioner is entitled to "Review and Reconsideration" of his Article 36 claim.[3]

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a habeas petitioner is not entitled to a writ of habeas corpus unless the challenged state court decision is either "contrary to" or "an unreasonable application of" clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1); *see also Williams v. Taylor*, 529 U.S. 362, 367 (2000). A state court's decision is "contrary to" clearly established Supreme Court law "if the state court arrives at a conclusion opposite to that reached by the Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours." *Williams*, 529 U.S. at 405. To demonstrate an "unreasonable application" of clearly established federal law, a

---

[3] Petitioner mentions that he has two additional bases for his ineffective assistance of counsel claim, namely that his counsel failed to object to the prosecutor's improper comments and failed to object to the accountability instruction. While petitioner mentions these in his introductory pages, he never presents any argument on them. Therefore, I have not considered these two bases as properly before me.

13

habeas petitioner must establish that the state court unreasonably applied the controlling legal rule to the facts of the case. *Id.* at 407. The state court's application of Supreme Court precedent must be more than incorrect or erroneous. Rather, it must be "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002) (state court decision must lie "well outside the boundaries of permissible differences of opinion").

Before a federal court will consider a habeas corpus petition, a petitioner must satisfy several procedural requirements. Each claim must be presented on appeal to the Illinois appellate court and in a petition to the Illinois Supreme Court for discretionary review. *See, e.g., O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999). To satisfy this requirement, a petitioner must fairly present to the state judiciary both the operative facts and legal principles that control each claim. *Wilson v. Briley*, 243 F.3d 325, 327 (7th Cir. 2001). A petitioner's failure to fairly present each habeas claim to the state's appellate and supreme court in the time and manner required leads to a default of the claim, thus barring the federal court from reviewing the claim's merits. *Boerckel*, 526 U.S. at 848. In addition, a federal court may not review a claim which was rejected by a state court on an independent and

14

adequate state ground. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). A federal court, however, may excuse procedural default if a petitioner can show either cause for the default and actual prejudice as a result of the alleged violation of federal law, or can demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice. *Id.* at 750.

**Jury Instruction on Accountability**

Petitioner's first claim is that the jury instruction on accountability misstated Illinois law such that his due process rights were violated. Specifically he argues that the instruction given allowed the jury to convict petitioner for two murders under an accountability theory "without requiring the jury to find Caballero intended that a murder be committed." Am. Pet. at 16. At trial, the jury was instructed that:

> A person is responsible for the conduct of another person when either before or during the commission of *a crime* with the intent to promote or facilitate the commission of *a crime*, he knowingly solicits, aids, abets or agrees or attempts to aid the other person in planning or the commission of *a crime*.

*People v. Caballero*, 464 N.E.2d 223, 230 (Ill. 1984) (quoting jury instruction) (emphasis added by Illinois Supreme Court). Petitioner argues that the jury should have been instructed according to the Illinois pattern jury instruction on accountability:

> A person is legally responsible for the conduct of
> another person when, either before or during the
> commission of *an offense*, and with the intent to
> promote or facilitate the commission of *that offense*,
> he knowingly solicits, aids, abets, agrees to aid, or
> attempts to aid the other person in the planning or
> commission of *the offense*.

*Id.* (quoting Illinois Pattern Jury Instruction, Criminal, No.

5.03 (2d ed. 1981) (emphasis added by Illinois Supreme Court).

During deliberation, the jury sent a note to the judge which

stated:

> We interpret the law to mean this: if Juan is holding a
> gun on Frank and Michael, while nearby Popeye is
> murdering Arthur, even though Juan may not know the
> murder is being committed, Juan is equally as guilty as
> Popeye of the murder.   Is this a correct
> interpretation?

*Id.* at 230-31.

Upon receiving the question, the court called counsel into

chambers to discuss what, if any, response should be given.

Petitioner's trial counsel argued that the jury had received

proper instructions which should not be supplemented at all.  He

urged the court to simply inform the jury to continue its

deliberations with the existing instructions.   Over this

objection, the trial court called the jury into the courtroom and

said to them:

> Your answer should be found in the instructions, which
> are very specific, and basically there are two
> instructions that if you read them, I cannot see how

16

> you can have any problems, and that is the
> accountability instruction which reads a person is
> responsible for the conduct of another person when
> either before, or during the commission of a crime,
> with the intent to promote, or facilitate the
> commission of a crime, he knowingly solicits, aids or
> abets or agrees or attempts to aid the other person in
> planning or the commission of a crime.
>
> If you read that and read the murder instruction which
> basically reads that, that the defendant or one [for]
> whose conduct he is responsible performed the acts
> which caused the death of Michael Salcido and second,
> when the defendant or one for whose conduct he is
> responsible did so, he or one [for] whose conduct he is
> responsible intended to kill or do great bodily harm to
> Michael Salcido, or he, or one for whose conduct he is
> responsible knew his acts . . . if you read those two
> in conjunction, I really can't see where you have any
> great problems.

464 N.E.2d at 231.

In addressing this claim, the Illinois Supreme Court noted that the trial court read the accountability and the murder instruction together and "[b]y linking the two instructions together for the jury, we believe that the trial court obviated the potential for error which the defendant now argues. Linking the instructions made it clear that the jury could convict for murder by accountability only if [petitioner's] unlawful restraint of some of the victims was intended to facilitate the murder of others." 464 N.E.2d at 231.

In addition, the court went on to hold that any error in the giving of the accountability instruction was waived by

17

petitioner's failure to make a specific objection to the alleged error at the conference on instructions.   At the instructions conference, with instruction number 8 being the accountability instruction, the trial court stated, "No objections to Number 1, 2, 3, 4, no objection.  Numbers 5, 6, 7, 8, 9, 10 are given over objection and basically the [petitioner] objects to this one on the basis of [the] accountability portion thereof."  The Illinois Supreme Court held, "Although the record reflects that there was a general objection to the accountability instruction, nothing in the record indicates that the specific nature of the objection was called to the trial court's attention.  We must therefore hold that the specific error in this instruction now complained of has been waived."  464 N.E.2d at 232.

The court also held that even if the instruction had improperly stated the law of accountability, petitioner was not prejudiced by the giving of this instruction.  The Supreme Court also noted that it had recently approved the wording of the accountability instruction given in *People v. Terry*, 460 N.E.2d 746 (Ill. 1984), which was substantially the same as the one given to petitioner.

Petitioner argues that the instruction "encouraged the jury to convict Mr. Caballero of murder under a theory of accountability without requiring the jury to find Caballero

intended that a murder be committed." Am. Pet. at 16.[4]  In support, petitioner points to the jury's question as indicating that they convicted him without finding intent to murder. Petitioner provides no explanation for his general assertion that using "a crime" instead of "the offense" in the accountability instruction was behind the jury's question, or how petitioner understands those two words to have different meanings in this context.

Respondent argues that, among other things, this claim is procedurally defaulted as it was rejected on an independent and adequate state law ground.[5]  In affirming petitioner's

---

[4] I agree with respondent and the state court that the trial judge's comment, "I cannot see how you can have any problems," was a comment on the adequacy of the instructions and not a comment on the strength of the evidence.  I likewise see no error in the trial judge's decision to link together the accountability instruction and the murder instruction in response to the jury's question.

[5] Generally, errors of state law are not cognizable on habeas review.  *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  "The remedial power of a federal habeas court is limited to violations of the petitioner's federal rights, so only if a state court's errors have deprived the petitioner of a right under federal law can the federal court intervene." *Perruquet v. Briley*, 390 F.3d 505, 511 (7th Cir. 2004).  Thus, "[b]ecause a state trial court's evidentiary rulings and jury instructions turn on state law, these are matters that are usually beyond the scope of federal habeas review."  *Id*. (citing *McGuire*, 502 U.S. at 71-71).  However, in some limited circumstances, a state court's jury instruction error may violate a defendant's due process right to a fundamentally fair trial under the Fourteenth Amendment where the state court committed "an error so serious as to render it likely that an innocent person was convicted[.]"  *Id*. at 510.  Here,

19

conviction, the Illinois Appellate Court held that petitioner procedurally forfeited his challenge to the jury instructions by failing to object to the instructions during trial or raising the issue in a post-trial motion.

Petitioner argues that his claim is not procedurally defaulted because "the state court finding that it was waived was not reasonable." Reply at 4. Petitioner argues that the state court unreasonably concluded that trial counsel's objection to the accountability instruction was not specific enough to alert the court to petitioner's argument regarding use of the phrase "a crime" instead of "the offense." In support, petitioner cites to *Lane v. Williams*, 826 F.2d 654, 661 (7th Cir. 1987). In *Lane*, the Seventh Circuit concluded that there was no independent and adequate state court grounds for waiver when the state court record showed that trial counsel did, in fact, clearly present an objection to the prosecution's improper comments on petitioner's failure to testify. 826 F.2d at 661.

The facts of this case, however, are not so clear cut. Here, defense counsel made a general objection to the accountability instruction, but did not alert the trial judge to the fact that he specifically objected to the use of the phrase "a crime" and instead wanted the instruction to include the

_____

petitioner argues that his due process rights were violated by the alleged error in the jury instructions.

phrase "the offense."  "To preserve for review an alleged error in an instruction, the grounds for the objection must have been specifically pointed out to the trial so that court may have an opportunity to consider and correct the alleged error." *Caballero*, 464 N.E.2d at 231-32.  In addition, "A state is entitled to treat as forfeited a proposition that was not presented in the right court, in the right way, and at the right time – as state court rules define those courts, ways, and times." *Szabo v. Walls*, 313 F.3d 392, 395 (7th Cir. 2002) (internal citations omitted).  This case is distinguishable from *Lane* because counsel in that case presented his specific objection to the judge and there was therefore no basis for a finding of waiver by the state court.  Here, the state court concluded that petitioner did not present a specific objection to the trial judge, and petitioner has pointed to nothing in the state record which indicates that counsel did in fact make a specific objection.  As a result, I find that the claim is procedurally defaulted.[6]  The fact that the state court also addressed the claim on the merits does not alter this conclusion. *See Burris v. Farley*, 51 F.3d 655, 660 (7th Cir. 1995) (a "dual-ground decision" nonetheless is insulated from federal review).

---

[6] Petitioner makes no argument that he can show either cause and prejudice, or actual innocence, which would allow me to consider this procedurally-defaulted claim.

21

Even if the claim were not procedurally defaulted, this claim fails on the merits. First, I am not convinced that the instruction given at petitioner's trial was incorrect under Illinois law. The Illinois Supreme Court held, in *People v. Terry*, 460 N.E.2d 746, 749 (Ill. 1984), that the same instruction was an accurate statement of Illinois law on accountability. Although this case was pointed out by respondent, petitioner does not address the clear holding of this case and thus presents no reason why I am not bound by the court's conclusion. Second, petitioner's main argument – that the instruction was improper because it allowed the jury to convict petitioner even if there was no evidence that petitioner intended that a murder be committed – is flawed. In fact, Illinois law, under an accountability theory, does not require proof of intent to murder for a murder conviction. *See Terry*, 460 N.E.2d at 749 (Illinois law incorporates the "common design rule"; common design or plan to commit battery sufficient for murder conviction under accountability theory where murder was in furtherance of the battery).[7]

---

[7]  Further, I agree with respondent that the jury's question does not support petitioner's position. Petitioner need not have known the precise moment Arthur was killed in order to be held responsible for his murder under an accountability theory. *See Terry*, 469 N.E.2d at 749.

22

Even if the instruction was erroneous, I do not find the alleged instructional error to have resulted in actual prejudice or to have substantially influenced the verdict, making it harmless under *Brecht v. Abrahamson*, 509 U.S. 619, 637 (1993). "The test is whether, in light of the record as a whole, the error had substantial and injurious effect or influence in determining the jury's verdict." *Id*. (internal citations omitted). As noted by the Illinois state court, the evidence against petitioner was "overwhelming." In his confession, petitioner specifically admitted that he and his co-offenders made a plan to kill the three men so that they could not be identified. As the Illinois Supreme Court held,

> From the time the four assailants conversed in Spanish, concluding that they had to kill the three young men, until they procured Michael's socks from his suitcase and attempted to wipe the vehicle clean of fingerprints, discarded the knife and left the alley, there was no evidence that the [petitioner] had any other criminal intent not related to the killings. When the [petitioner] restrained Michael and Frank, it was not a simple unlawful restraint, it was for the purpose of aiding and abetting the murder of Arthur, and a part of the over-all plan to systematically kill all three. The evidence all clearly shows that the [petitioner] was an active, willing participant in all three of these murders.

*Caballero*, 464 N.E.2d at 232. The Illinois Supreme Court reasonably held this evidence[8] supported its affirmance of the

---

[8] Petitioner argues that the "overwhelming" evidence of guilt comes only from petitioner's confession, which he maintains was coerced. Given the fact that the confession was admitted

jury's verdict, and rendered petitioner's claim of error harmless. *See Thomas v.* Peters, 48 F.3d 1000 (7th Cir. 1995) (jury instruction error subject to harmless error analysis); *Jenkins v. Nelson*, 157 F.3d 485, 494 (7th Cir. 1998). I agree and conclude that petitioner was not denied his right to due process of law based on the accountability instruction given at his trial.

**Prosecutorial Misconduct Claim**

Petitioner argues that the prosecutor made various statements to the jury "so that it would impose a death penalty, based not on the applicable law and facts but because of emotion." Am. Pet. at 19. In addition to those mentioned below, the prosecutor: characterized trial counsel's argument as "a bunch of double talk" and "a bunch of nonsense"; reminded the jury that "Mrs. Mussa will never see her son" and "Mrs. Salcido will not see her two sons"; called petitioner "a vicious cold-blooded killer" who "kills people like he's swatting flies."

---

into evidence at the trial and all claims regarding the confession have been rejected (and are not before me here), petitioner's argument is irrelevant to my analysis. Further, I reject petitioner's assertion that there was no evidence that "the stabbings were planned or that Caballero was involved in its planning." Reply at 8. In his confession, Caballero specifically admitted that the four men, in Spanish, decided that they had to kill the three victims so that they could not be identified.

Respondent argues that even if the statements were improper, petitioner was not prejudiced by them.

The Illinois Supreme Court recognized that the prosecutor made "many improper remarks during his summation." *People v. Caballero*, 533 N.E.2d at 1097. For example, the court noted that it was improper for the prosecutor to argue that petitioner was an "animal" and that an acquittal would "turn the streets over to the punks, and the animals and people like him." *Id*. Ultimately, the court concluded that at least one improper comment was provoked by defense counsel's statement that petitioner had been "framed."

In *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), the Supreme Court established a two-prong test for determining whether a prosecutor's comments in closing argument constituted a denial of due process. First, a court determines whether the comments were improper. If they were, then the court must consider a number of factors to determine whether petitioner was prejudiced by the comments. *See Ellison v. Acevedo*, 593 F.3d 625, 635-36 (7th Cir. 2010). The factors that determine whether a petitioner was prejudiced include: (1) whether the prosecutor misstated the evidence; (2) whether the remarks implicate a specific right of petitioner; (3) whether the petitioner invited the response; (4) the trial court's instructions to the jury;

25

(5) the weight of evidence against the petitioner; and (6) the petitioner's opportunity to rebut. *Id.* In determining prejudice, "the relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (quoting *Darden*, 477 U.S. at 181).

While the Illinois Supreme Court did not mention *Darden* by name, its analysis is not contrary to, or an unreasonable application of, *Darden*.[9] The court noted that at least one of the improper comments (concerning the prosecutor's statement that he did not go to law school for four years at night to put innocent men in the penitentiary) was made in rebuttal to comments made by defense counsel. In addition, the court noted that the evidence of guilt, which included petitioner's confession as well as physical evidence, was "overwhelming." Finally, I agree with respondent that the *Darden* factors not considered by the state court also support its decision. The statements did not misstate the evidence or implicate a specific right of petitioner, and the jury was told that it should

_____

[9]  Without explanation, petitioner states that the state court's decision, in addition to being an unreasonable application of clearly established federal law, "resulted from an unreasonable determination of the facts." Because petitioner fails to explain how his claim fails under § 2254(d)(2), this argument is waived. Petitioner's argument, as presented, falls squarely within § 2254(d)(1).

disregard statements in argument that were contrary to evidence presented.

**Inconsistent Prosecution Theories**

Next, petitioner argues that his due process rights were violated when the state allegedly pursued inconsistent theories of culpability when it tried petitioner, and then thirteen years later when it tried LaBoy. The Illinois Supreme Court rejected this argument, holding that the state used essentially the same facts, but made different arguments from those facts, and that the interval of time and separate sources of evidence explained any factual discrepancies. Here, respondent argues that this is not a viable claim because there is no United State Supreme Court precedent contrary to the state court's decision. I agree. While courts of appeals have held that inconsistent prosecutorial theories can violate due process, the United States Supreme Court has not.[10] Most recently, in a pre-AEDPA case, the Sixth Circuit

---

[10] Petitioner cites many circuit court and United States Supreme Court cases dealing with a variety of subjects (such as prosecutors presenting false testimony or failing to correct false testimony) which he relies on to argue that "[c]ollectively, the Supreme Court decisions scrutinizing improper prosecution argument and the presentation of false testimony set a clear standard for the proposition that uncorrected false statements by a prosecutor creates an unacceptably high risk to the integrity of the judicial process." Reply at 19. I am not convinced that this mosaic of cases, none of which deal with the issue of conflicting prosecutorial theories, can be considered "clearly established" United States Supreme Court precedent. Further, the two Supreme Court cases cited by petitioner are

held that inconsistent positions taken by the prosecution can violate a defendant's due process rights. *Stumpf v. Houk*, No. 01-3613, --- F.3d ---, 2011 WL 3506101 (6th Cir. Aug. 11, 2011). However, *Stumpf* was not governed by AEDPA and its requirements concerning existing Supreme Court precedent. In his dissent, Justice Boggs implicitly recognized that there is no "clearly established" United States Supreme Court precedent when he stated that the outcome of *Stumpf* could not be relied upon by habeas petitioners proceeding under 28 U.S.C. § 2254 because "the majority's rule is not clearly established Supreme Court precedent, *see* 28 U.S.C. § 2254(d), and post-AEDPA habeas petitioners are therefore unable to avail themselves of it[.]" *Stumpf*, 2011 WL 3506106, at *14. This claim is therefore denied.

**Sentencing Disparity**

Petitioner argues that his life sentence violates the Eighth Amendment because his co-offender, Ruiz, received a lesser, sixty year sentence. Once again, respondent argues that the claim is

---

distinguishable and do not hold that a petitioner's right to due process can be violated when a prosecutor takes contradictory positions. *See Green v. Georgia*, 442 U.S. 95 (1979) (court's discussion focused on whether or not exclusion of proffered testimony constituted a violation of petitioner's due process rights, not whether prosecution took inconsistent positions); *Miller v. Pate*, 386 U.S. 1 (1967) (prosecutor's deliberate misrepresentation that shorts were stained with blood when he knew they were stained with paint violated petitioner's due process rights; no discussion of any inconsistent positions taken by prosecutor).

procedurally defaulted because the state courts rejected it on an independent and adequate state ground. Petitioner first raised this issue in his fourth postconviction petition, but the trial court denied leave to file it because petitioner had failed to attach transcripts from Ruiz's sentencing hearing. The appellate court affirmed, reasoning that the claim depended on Ruiz's resentencing, and that petitioner's failure to attach the transcripts was fatal to his petition. Petitioner tried to raise the claim again in his sixth postconviction petition, this time attaching the transcripts from Ruiz's sentencing hearing. The trial court held, and the appellate court affirmed, that the claim was *res judicata* because petitioner had raised it in his fourth postconviction petition.

Petitioner argues that I should reject the state court's conclusion because the state court violated its own procedural rules. Petitioner explains that as soon as he learned that Ruiz had received a 60-year sentence, he immediately sought to bring the claim to the court's attention, and did so before the Ruiz sentencing transcript was even prepared. Because the transcript was not yet prepared, petitioner appended Ruiz's original hearing transcript, Ruiz's prison record reflecting the new sentence, and Nelson Aviles's testimony. "Rather than waiting for the resentencing transcript to be prepared, counsel filed the

29

petition as soon as she was appraised of [the] development."
Reply at 27. Petitioner points to 725 ILCS 5/122-1 et seq. which
describes the necessary content of a state postconviction
petition. He argues that his petition "stated allegations with
supporting information, which, if proved, would have entitled Mr.
Caballero to relief[,]" *id.* at 28-29, and that is all that is
required under 725 ILCS 5/122-2.

I conclude that this claim was denied on an independent and
adequate state law ground. Under 725 ILCS 5/122-2,

> The petition shall identify the proceeding in which the
> petitioner was convicted, give the date of the
> rendition of the final judgment complained of, and
> clearly set forth the respects in which petitioner's
> constitutional rights were violated. The petition
> shall have attached thereto affidavits, records, or
> other evidence supporting its allegations or shall
> state why the same are not attached. The petition
> shall identify any previous proceedings that the
> petitioner may have taken to secure relief from his
> conviction. Argument and citations and discussion of
> authorities shall be omitted from the petition.

Petitioner essentially argues that it was unreasonable for the
state court to not allow him to file his fourth postconviction
petition in light of the fact that the Ruiz transcript was not
yet available. However, petitioner fails to explain why he could
not have waited until the transcript was available before filing
his fourth postconviction petition. Nor does he put forward any
argument that he informed the court in his fourth postconviction

petition of the reasons that he did not append the transcript. Petitioner takes issue with the court's requirement that the transcript be attached, but the language in § 5/122-2 supports the notion that the state court may require that certain "affidavits, records or other evidence supporting its allegations" be attached to the petition. Because the state court relied on an independent and adequate state law ground for dismissal, this claim is procedurally defaulted in this court. Because petitioner fails to make any argument regarding cause and prejudice (or actual innocence), I cannot consider this claim.

**Ineffective Assistance of Counsel**

Petitioner argues that his trial counsel was ineffective because he failed to put forward certain mitigation witnesses solely because they were not categorically opposed to the death penalty in all situations. In 1989, the Illinois Supreme Court found that petitioner's claim regarding mitigation witnesses raised allegations of a substantial constitutional deprivation and remanded to the circuit court for an evidentiary hearing. *Caballero*, 533 N.E.2d at 1103. After noting that the witnesses' affidavits confirmed petitioner's argument that the mitigation witnesses were rejected because they were not opposed to the death penalty in all situations, the court stated, "We are unable to understand how these witnesses' support of the death penalty

31

would have damaged their credibility. *Id*. at 1099. The Supreme Court concluded that "the statements in the [witnesses'] affidavits which allege that defense counsel rejected some of the mitigation witnesses because they did not oppose the death penalty raise a serious question as to counsel's competence." *Id*. at 1099.

On remand, the trial court held a two-day hearing after which the court concluded that petitioner had not met the two *Strickland* requirements. On appeal, the Illinois Supreme Court listed in detail the testimony of the twelve witnesses called at the hearing, including: five staff members of Inter City Impact (a religiously-affiliated group with which petitioner was involved prior to his involvement in the gang), petitioner's sister and mother, two witnesses who were called as mitigation witnesses (a former teacher and a neighbor), a reverend and his wife, and petitioner's trial counsel. The Illinois Supreme Court concluded that petitioner could not show that he was prejudiced by his counsel's failure to call more witnesses:

> [D]efendant had confessed to the vicious multiple murders in graphic detail and without remorse. The defendant gave a detailed confession of his guilt, which was admitted at the trial. In this confession he told how he, together with three companions, abducted the three victims, who had claimed to know members of a rival gang. He also admitted in the confession that he personally stabbed and cut the throat of one of the victims. Extensive physical and forensic evidence

corroborated many of the details of the confession. After defendant gave a statement, the assistant State's Attorney asked defendant if he had it to do over "would he do it again." The [petitioner] stated that he would "if it was a sure thing." The assistant State's Attorney again replied, "Well you got caught, Juan. Would you do it if you had it to do all over again?" The defendant replied, "I'd kill Michael for sure, but I don't know about the other two." The prosecution also introduced evidence that the [petitioner] had made a less specific admission of guilt to a cellmate. The evidence the extra mitigating witnesses [petitioner] produced at his post-conviction hearing would have provided could not have precluded the imposition of the death penalty.

604 N.E.2d 913, 922 (Ill. 1992).

To establish ineffective assistance of counsel, a petitioner must demonstrate: (1) that his attorney's performance was deficient; and (2) that such representation prejudiced his case. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The first prong is satisfied by showing that counsel's performance fell below the "objective standard of reasonableness" guaranteed under the Sixth Amendment. *Barker v. United States*, 7 F.3d 629, 633 (7th Cir. 1993) (quoting *Strickland*, 466 U.S. at 687). To satisfy the *Strickland* prejudice element, a petitioner must demonstrate that it is reasonably likely that, but for his counsel's errors, the decision reached would have been different. *Strickland*, 466 U.S. at 696. When challenging his sentence, a petitioner must show that, without counsel's errors, there is a reasonable probability that he would have received a different

33

sentence. *Id*. "Courts assess that probability by evaluating the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding – and reweigh[ing] it against the evidence in aggravation." *Griffin v. Pierce*, 622 F.3d 831, 844 (7th Cir. 2010) (internal citations omitted). On habeas review, I review for reasonableness the state court's determination that "such a probability does not exist." *Id*. Further, "The petitioner's bar is set high, and only a clear error in applying *Strickland* will support a writ of habeas corpus." *Id*. (internal citations omitted).

Because the Illinois Supreme Court applied the correct legal standard from *Strickland*[11], my review of its decision is "doubly

---

[11] I reject petitioner's argument that the Illinois Supreme Court applied the wrong standard for prejudice under *Strickland*. First, the court correctly stated that petitioner must show that "there is a 'reasonable probability that, absent the errors, the sentencer – including an appellate court, to the extent it independently reweighs the evidence – would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" 604 N.E.2d at 921 (quoting *Strickland*, 466 U.S. at 687-88). Later the court described the prejudice standard as a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. (quoting *Strickland*, 466 U.S. at 693). A third time the court correctly stated the prejudice test when it stated that "a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Id*. (quoting *Strickland*, 466 U.S. at 695-96). In light of the fact that the court clearly understood the proper test for prejudice under *Strickland* and applied it in its opinion, the court's conclusory statement that the omitted evidence "could not have precluded the imposition of the death penalty"

deferential." *Cullen v. Pinholster*, --- U.S. ---, 131 S.Ct. 1388, 1403 (2011). That is, I must first take "a highly deferential look at counsel's performance," *id.*, in which "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Then, I must view petitioner's claim through the "deferential lens of § 2254(d)." *Pinholster*, 131 S.Ct. at 1403 (quoting *Knowles v. Mirzayance*, 129 S.Ct. 1411, 1418 n.2 (2009)). That means that the "pivotal question" is not whether "defense counsel's performance fell below *Strickland*'s standard," but whether "the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, --- U.S. ---, 131 S.Ct. 770, 785 (2011).

The evidence at the hearing was described in detail by the Illinois Supreme Court. The omitted evidence showed, among other things, that petitioner was "gentle," a "follower," someone who committed a "horrible mistake," a "leader," protective of his

---

indicates its conclusion that the minimal nature of the omitted evidence was such that there was virtually no probability of a different outcome at all. In the alternative, given the court's repeated recitation of the proper standard, the statement identified by petitioner was an incorrect shorthand version of the *Strickland* standard. *See Woods v. Schwartz*, 589 F.3d 368, 378 n.3 (7th Cir. 2009) ("We have noted numerous times that there is no error when a court correctly noted the *Strickland* standard and then used an incorrect shorthand version when stating its conclusion).

sister, a good worker, a helpful young man, a "good friend," trustworthy, not a violent person, not someone who used drugs, alcohol or carried a weapon. The hearing also included testimony that petitioner was influenced by, and looked up to, his older brother who was a gang member.

In reviewing this evidence, the Illinois Supreme Court weighed heavily the fact that petitioner made a graphic confession to multiple murders, during which petitioner and his three co-offenders abducted the three victims and stabbed them to death. Petitioner admitted that he personally stabbed and cut the throat of one of the victims, continuing while the victim was dying and pleading for mercy. Petitioner admitted to an assistant state's attorney that he would commit murders again if guaranteed that he would not be caught, and he stated that he would commit one of the murders again even knowing he would be caught. In the end, the Illinois Supreme Court concluded that in light of this aggravating evidence, petitioner could not show prejudice.

I note first that it is not the job of a district court reviewing a habeas petition to conduct its own *Strickland* analysis *de novo*. Instead, my job is to review the Illinois Supreme Court's analysis and determine whether it was "objectively unreasonable." Having reviewed the Illinois Supreme

Court's ruling on this claim, I cannot conclude that their holding – that petitioner failed to show that he was prejudiced by his counsel's failures at the penalty phase -- was objectively unreasonable.[12]  While the omitted evidence might have helped to paint petitioner generally in a somewhat better light, the state court's conclusion that there was not a reasonable likelihood that petitioner's sentence would have changed was reasonable. *See Lear v. Cowan*, 220 F.3d 825 (7th Cir. 2000) (no reasonable probability that mitigating evidence that petitioner was a good student, had a low IQ, used cocaine and had an antisocial personality would have changed outcome of sentencing).  Nor am I convinced by petitioner's argument that the state court's conclusion was "objectively unreasonable" because, in an earlier opinion ordering the evidentiary hearing, the Illinois Supreme Court contemplated that petitioner might be able to show prejudice.  Even in light of the court's earlier opinion, I cannot conclude that the Illinois Supreme Court's holding on prejudice fell "well outside the boundaries of permissible differences of opinion." *Hardaway*, 302 F.3d at 762.  In light of

---

[12]  Given that petitioner is already serving a life sentence, respondent argues that in order to show prejudice petitioner must show that he would have received a sentence less than life.  Petitioner disputes this.  Because I conclude that the state court's conclusion regarding prejudice (which determined if there was a reasonable probability that the petitioner would have received a sentence other than death) is not objectively unreasonable, I need not resolve this dispute.

the fact that the mitigation evidence was not particularly compelling, and considering the graphic and brutal nature of the crimes, the lack of remorse and petitioner's statement that he would commit the murders again, the state court's conclusion was not objectively unreasonable.[13]

**The Vienna Convention Claims**

Article 36 of the Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77 ("Vienna Convention") requires law enforcement officers to notify a detained foreign national, without delay, of his right to communicate with and contact his consulate. Petitioner is one of 52 Mexican nationals whose cases were the subject of proceedings in *Avena*. In *Avena*, Mexico brought suit on its own behalf and on behalf of 52 Mexican nationals who it alleged had been tried and sentenced to death in the United States without timely access to consular assistance. Finding that the United States had violated the rights of Mexico and its nationals under Article 36 of the Vienna Convention, the ICJ held that the United States must provide all of the affected Mexican nationals with judicial "review and reconsideration" of

---

[13] Petitioner argues that the Illinois Supreme Court's ruling on this claim was "an unreasonable determination of the facts" in violation of 28 U.S.C. § 2254(d)(2). In light of the fact that petitioner does not point to a single factual error, I agree with respondent that petitioner is actually making an "unreasonable application" argument under 28 U.S.C. § 2254 (d)(1).

38

their convictions and sentences to determine in each case if the violations were prejudicial. Petitioner argues here that he is entitled to "review and reconsideration" of his claim of alleged consular rights violations. Further, he argues that his trial counsel was ineffective for failing to raise this issue.

Turning first to petitioner's claim that he is entitled to "review and reconsideration" of the alleged consular rights violation claim, respondent argues that this claim is procedurally defaulted because it was denied by the state court on an independent and adequate state ground.

In his third state postconviction petition, petitioner first argued that his rights under Article 36 fo the Vienna Convention had been violated because police denied him the opportunity to contact the Mexican Consulate prior to his post-arrest interrogation. The state appellate court affirmed the trial court's conclusion that the claim was forfeited because it had not been raised in petitioner's first postconviction petition. *People v. Caballero*, No. 1-03-1405 (Ill. App. Ct. Sept. 30, 2004) (noting that a claim alleging the substantial denial of a constitutional right that was not raised in the original or an amended postconviction petition is considered waived when subsequently asserted in a successive petition). The state appellate court further held that petitioner did not satisfy the

cause and prejudice test that would have excused the procedural default. *Id.* Petitioner tried to raise the claim again in his fifth postconviction petition, but the state appellate court again held that petitioner had defaulted it by omitting it from his original postconviction petition, that the subsequent *Avena* decision did not constitute cause, and that petitioner could not demonstrate prejudice because he had been advised of, and understood, his *Miranda* rights. *People v. Caballero*, Nos. 1-06-3199 and 1-08-1285 (Ill. App. Ct. Mar. 31, 2010). The court further found the claim barred by *res judicata* because petitioner had raised it in his third postconviction petition.

The United States Supreme Court has confirmed that Vienna Convention claims are subject to procedural default in state courts. *See Sanchez-Llamas v. Oregon*, 548 U.S. 331, 351 (2006) (citing *Breard v. Greene*, 523 U.S. 371 (1998)). The Court explained that the ICJ's decision in *Avena* did not alter the Court's conclusion. *Id.* at 353-57; *see also Medellin v. Texas*, 552 U.S. 491, 504 (2008) (recognizing that *Avena* does not have binding effect on federal courts).

Petitioner recognizes that the current state of the law, as announced by the United States Supreme Court, is that the ICJ's *Avena* decision "has no binding effect on the domestic courts of this nation." *Caballero*, No. 1-06-3199, at 15 (Ill. App. Ct.

40

Mar. 31, 2010).  Petitioner argues that he will likely be entitled to "review and reconsideration" at some future date and therefore "to abandon the claim at this time would not be prudent."  Am. Pet. at 52.  According to petitioner, the current presidential administration has recognized the duty of the United States to implement the *Aveda* holding.  Further, petitioner notes that on June 14, 2011, Senator Patrick Leahy introduced the Consular Notification Compliance Act, which would grant a right to the judicial process required under *Avena*.  Under the proposed Act, a petition raising a violation of Article 36 shall not "be considered a second or successive habeas corpus application or subjected to any bars to relief based on preenactment proceedings. . . [.]"  Consular Notification Compliance Act, §4(a)(5).  Suggesting that the scope of the proposed Act could conceivably be amended to cover only those petitioners whose federal habeas corpus proceedings are not yet final, petitioner asks that I stay proceedings in this case to allow Congress an opportunity to pass the proposed Act implementing the *Avena* judgment.

This federal habeas case is 14 years old.  The case has been stayed for years while petitioner pursued his multiple state postconviction petitions.  Given the extended life of this case, and given the obvious fact that the proposed legislation may

41

never be passed, I am not inclined to prolong this case any further. *See Garcia v. Texas*, — U.S. –, 131 S.Ct. 2866 (2011) (rejecting petitioner's argument for a stay of execution even though he argued that Congress was considering potential legislation implementing the *Avena* decision; noting "we are doubtful that it is ever appropriate to stay a lower court judgment in light of unenacted legislation"). In light of the fact that the United States Supreme Court has held that claims based on violations of the Vienna Convention are subject to a state's procedural default rules, I agree with respondent that the state court had the right to reject petitioner's Vienna Convention claim as waived. Because it was rejected on an independent and adequate state ground (and petitioner has not argued that any exception to default applies), I cannot consider this claim.

Finally, petitioner argues that his trial counsel was ineffective for failing to argue that his Article 36 rights were violated. Petitioner claims that he raised this claim in his third state postconviction petition, but that the Illinois appellate court ignored the claim and never ruled on it. Respondent responds by asserting that this claim was, in fact, addressed by the appellate court, which rejected it on independent and adequate state law grounds. My review of the

42

Illinois appellate court's opinion confirms the respondent's position. On page 2 of the opinion, the court noted that petitioner argued that "his counsel was ineffective for failing to raise the issue [of his Article 36 rights] sooner." *People v. Caballero*, No. 1-03-1405, at 2 (Ill. App. Ct. Sept. 30, 2004). Later, the court, in discussing whether petitioner could show "cause" for failing to bring the Vienna Convention claim sooner, stated,

> We note that in his post-conviction petition [petitioner] also generally asserts that he did not raise his Vienna Convention claim earlier because all of his preceding counsels were ineffective for not informing him of his right to contact the Mexican Consulate. However, not only is [petitioner's] ineffective assistance claim not adequately developed in his petition and in his appellate brief (see 188 Ill. 2d R. 341(e)(7) (appellant must provide argument and citation to authority to support his assertions)), the opinion of the supreme court in [petitioner's] last appeal belies his assertion that anyone knew of [petitioner's] status as a foreign national prior to trial in order to raise a Vienna Convention claim. *Caballero*, 206 Ill. 2d at 101 ("[d]uring [petitioner's] trial, he and his co-offenders were all believed to be United States citizens").

*Caballero*, 1-03-1405, at 17. As this passage shows, the appellate court rejected the ineffective assistance claim because it was "not adequately developed in his petition and in his appellate brief." *Id*. Although the court also noted that there was no substantive basis for petitioner's claim, that does not alter the fact that the state court relied on an independent and

43

adequate state law grounds for rejecting the claim. *See Burns*, 51 F.3d at 660. The claim is also procedurally defaulted because petitioner failed to raise this ineffective assistance allegation in his PLA to the Illinois Supreme Court. *See Boerckel*, 526 U.S. at 845 (claims not raised through one complete round of state court review are procedurally defaulted). Petitioner has not argued that any exceptions to procedural default might apply here.

## IV.

For all the foregoing reasons, Caballero's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied. As a result, no discovery or evidentiary hearing is necessary.

**ENTER ORDER:**

_____
      **Elaine E. Bucklo**
   United States District Judge

Dated: September 30, 2011

44